Victor J. Sandoval (SBN 344461)
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd. Suite 1121
Los Angeles, California 90034
562-534-5907
victor@almeidalawgroup.com

*Counsel for Plaintiff & Proposed Classes*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBIN SAVAGE, *on behalf of herself and all others similarly situated,*<br><br>Plaintiff,<br><br>vs.<br><br>KOBY EMPIRE, INC.,<br><br>Defendant. | Case No. 8:26-cv-1401<br><br>**CLASS ACTION COMPLAINT**<br><br>1. VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §2510, *et seq.*<br>2. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CALIFORNIA PENAL CODE §631, *et seq.*<br>3. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CALIFORNIA PENAL CODE §632, *et seq.*<br>4. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CALIFORNIA PENAL CODE §638.5, *et seq*<br>5. INVASION OF PRIVACY, CALIFORNIA CONSTITUTION ARTICLE 1 §1<br>6. BREACH OF CONTRACT<br>7. BREACH OF IMPLIED CONTRACT<br>8. UNJUST ENRICHMENT<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiff Robin Savage ("Plaintiff") brings this class action lawsuit against Koby Empire, Inc. ("Koby Empire" or "Defendant"), individually and on behalf of all others similarly situated, and alleges the following based upon personal knowledge as to herself and her actions, knowledge and experiences, and upon information and good faith belief as to all other matters.

## **INTRODUCTION**

1.　　This class action lawsuit challenges Koby Eire's practice of secretly intercepting and transmitting the private communications and personal data of users of its Sunflower mobile application (the "App" or "Sunflower") to Meta Platforms, Inc. ("Meta" or "Facebook") through the Facebook SDK—a third-party software development kit ("SDK") that, once embedded in an application's source code, secretly intercepts and transmits user data to Meta's servers for advertising and analytics purposes (the "Tracking Technology")—without the knowledge or consent of its users.

2.　　Koby Empire is a mobile application developer and registered mental health provider that publishes the Sunflower App, a sobriety tracker and addiction recovery application available on Apple's iOS App Store and Google's Play Store. [1]

3.　　The App provides tools for tracking sobriety milestones, managing cravings, conducting cognitive behavioral therapy exercises, and communicating with an artificial intelligence ("AI") sponsor about deeply personal aspects of a user's addiction and recovery journey.[2]

---

[1] *Sunflower – Quit Any Addiction*, Apple App Store, https://apps.apple.com/us/app/sober-day-counter-sunflower/id1547099435 (last visited May 20, 2026).

[2] *Id.*

CLASS ACTION COMPLAINT

1

4.      The App has been downloaded by over 192,000 users [3] and was developed through Y Combinator, the prominent startup accelerator. [4] Sunflower is available in multiple languages and countries worldwide.

5.      Unbeknownst to users, Koby Empire embedded the Facebook SDK within the App that secretly intercepts and transmits users' private communications, app usage data, and device identifiers to Meta for advertising and analytics purposes

6.      Users of the App reasonably expect that their personal interactions—including their sobriety tracking data, substance abuse history, craving journal entries, and other profoundly sensitive health and wellness information—will remain private and confidential.

7.      The information transmitted by the App is inherently private and personal, falling within categories—including mental health data, substance abuse treatment records, and behavioral health information—that courts, legislatures, and regulatory bodies have consistently recognized as among the most sensitive forms of personal information available. [5]

8.      The data collected by Sunflower includes emotional vulnerabilities, substance abuse patterns, recovery milestones, relapse triggers, and psychological well-being.

---

[3] https://sunflowersober.com (last visited May 20, 2026).

[4] https://www.ycombinator.com/companies/sunflower (last visited May 20, 2026) (stating that Sunflower grew to over 100,000 monthly active users in under six months).

[5] *See* Danielle Keats Citron, *A New Compact for Sexual Privacy*, 62 Wm. & Mary L. Rev. 1763, 1769 (2021) (noting that "Intimate data reveals people's physical and emotional vulnerabilities, which firms exploit to their advantage. When intimate data is leaked or disclosed to hackers and criminals, individuals have an increased risk of reputational ruin, blackmail, and extortion.").

CLASS ACTION COMPLAINT
2

9.    The nonconsensual disclosure or mishandling of this data can cause irreversible harm—undermining users' autonomy, dignity, and equality, and chilling their willingness to seek addiction treatment and recovery support. [6]

9.    Because such data touches on the most personal aspects of human health, and because the emerging data-broker economy and artificial intelligence tools make it ever easier to extract, re-identify, and act upon such information, Koby Empire's obligation to safeguard it was correspondingly grave.

10.    Users who record their sobriety milestones, craving triggers, emotional states, and journal entries in the App disclose intimate details about their psychological condition and substance abuse history—information that, if exposed, could subject them to stigma, discrimination, or exploitation. [7]

11.    Not only is the data provided to the App highly sensitive, but Koby Empire's privacy policy (the "Privacy Policy") affirmatively misrepresents the nature and purpose of the tracking technologies deployed within the App. The Privacy Policy does ***not*** specifically disclose that users' data is transmitted to third parties like Meta for advertising purposes. [8]

---

[6] Brennan Ctr. for Justice, *Closing the Data Broker Loophole* 7–9 (2023), https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (warning that "the integration of new AI tools will make it easier to extract, re-identify, link, infer, and act on sensitive information about people's identities, locations, habits, and desires" and urging legislative action to curb the unregulated sale of behavioral data) (internal quotation marks omitted).

[7] Leonardo Horn Iwaya, *et al.*, *On the Privacy of Mental Health Apps: An Empirical Investigation and Its Implications for App Development*, 28 Empirical Software Eng'g, no. 1, 2023, at 1, 3–4 (finding that the "stigma around mental illnesses . . . increases the potentially negative impacts on users in case of privacy violations" and that "the mere link of users to a given app can reveal that they might be having some psychological problems (e.g., anxiety, depression, or other mental health conditions), which may make mental health apps users feel more vulnerable and fragile").

[8] https://www.sunflowersober.com/privacy-policy (last visited May 20, 2026).

12. Although the Privacy Policy vaguely references the use of "cookies and similar tracking technologies," it affirmatively represents to consumers that such technologies are used only "to collect and store your information." [9] To a reasonable consumer, this language conveys that the App uses standard first-party cookies to store information for the website operator's own purposes—not that the App deploys a third-party software development kit that secretly siphons users' sensitive substance abuse data to one of the world's largest advertising companies.

13. Furthermore, the Privacy Policy directs users seeking additional details to "refer to our Cookie Notice," but no such Cookie Notice exists anywhere on Defendant's website, in the App, or in any document accessible to users—rendering the disclosure not merely incomplete but affirmatively deceptive, as it creates the false impression that a more detailed explanation of Defendant's tracking practices is available when none is.

14. Moreover, it does not disclose that information is shared with third parties for advertising purposes, does not identify Meta by name, does not describe the scope of data collected by the Facebook SDK, and does not disclose that users' sensitive substance abuse and recovery data is transmitted to one of the world's largest advertising companies.

15. Further compounding this deception, rather than disclosing that users' private in-app activity would be intercepted in real time and transmitted to Meta's advertising infrastructure, the Policy states only that information may be shared "with affiliates, business partners, or other users when you interact in public areas of the service." [10] This disclosure fails on multiple levels. It does not identify that

---

[9]*Id.* (stating that "[w]e may use cookies and similar tracking technologies to collect and store your information").

[10]*Id.* (stating that "[w]e may share your information in situations such as business transfers, with affiliates, business partners, or other users when you interact in public areas of the service").

disclosures are for advertising purposes, nor does it name any specific third-party recipient: "Business partners" is a term of limitless elasticity that could encompass any commercial relationship, and such catchall language cannot be a substitute for meaningful notice that would put reasonable consumers on notice of how their data will be shared. It also identifies no data collection technology, no description of what data is collected, and no explanation of the purpose for which it will be used. And it affirmatively cabins the sharing scenario to conduct occurring in "public areas of the service"—the precise opposite of the private interactions at issue here. A reasonable user reading this language would have no basis to understand that their private interactions with the App are being intercepted and transmitted to Meta's advertising infrastructure.

16.    Defendant's Terms of Service (the "Terms of Use"), last updated January 18, 2024, provide that "[y]our use of the Site is also governed by our Privacy Policy" and that "[b]y using the Site, you consent to all actions we take with respect to your information consistent with our Privacy Policy." [11]

17.    But the actions Defendant takes with respect to users' information—transmitting their sensitive substance abuse data to Meta's advertising infrastructure through a secretly embedded SDK—are not "consistent with" the Privacy Policy, which affirmatively misrepresents the purpose of tracking technologies and references a nonexistent Cookie Notice. Consent to a materially misleading privacy policy does not constitute informed consent to the undisclosed practices it conceals. Moreover, the Facebook SDK begins collecting and transmitting data the instant the App launches, before any user has had any opportunity to review, let alone consent to, the Privacy Policy or Terms of Use.

[11] *Terms of Service,* https://sunflowersober.com/terms-of-service

CLASS ACTION COMPLAINT
5

18.     Koby Empire's representations about consumer privacy are false and misleading because Koby Empire surreptitiously transmits user communications to third parties through the Tracking Technology for advertising purposes.

19.     This conduct is especially egregious given that Koby Empire is a registered healthcare provider, maintaining National Provider Identifier ("NPI") number 1700757440 with the Centers for Medicare & Medicaid Services as a mental health provider.

20.     NPI is a government-recognized credential issued exclusively to healthcare providers which signals to users that their data will receive the heightened protections associated with medical treatment. [12]

21.     Koby Empire also assures users that the App is HIPAA-compliant. In one customer-facing entry on their website, Defendant states that:

> At Sunflower we consider ourselves tech-enabled medical practitioners who serve hundreds of thousands of patients, not just "users."
>
> This means our users tell us their deepest, darkest secrets; things they are not willing to tell anybody else, even their therapist or doctor. an assurance that is undermined by its transmissions of sensitive user health information.
>
> …
>
> Our promise as an organization is that we will never sell our users' data. We will protect their data. We will safeguard it and only use it to build a better product that helps people stay sober.

[12] *See Trust Center*, https://trust.delve.co/sunflower-sober   (last visited May 20, 2026).

CLASS ACTION COMPLAINT

6

**To this end, our entire consumer app is HIPAA compliant.**[13]

22.    Defendant betrays these assurances and breaches HIPAA-compliance by transmitting sensitive user data to Meta.

23.    Defendant's secret interception and disclosure of users' private communications and personal information to Meta violates the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* ("ECPA") and Cal. Penal Code §§ 631-632 and 638.5, and constitutes an invasion of privacy, breach of contract, breach of implied contract, and unjust enrichment.

## PARTIES

24.    Plaintiff Robin Savage is a citizen who, at all times relevant to this litigation, has resided (and continues to reside) in Laguna Woods, California, which is in Orange County.

25.    Defendant Koby Empire, Inc. is a corporation with its principal place of business at 4322 Buckingham Road in Royal Oak, Michigan 48073.

26.    Koby Empire is registered with the Centers for Medicare & Medicaid Services as a mental health provider under NPI #1700757440. Koby Empire develops, publishes, operates, and controls the App and is responsible for the selection, integration, and deployment of the third-party SDK at issue in this action.

## JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) this is a class action lawsuit in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) there are more than 100 members of

---

[13]*See Building a Safe & Ethical AI Companion for* Sobriety, https://sunflowersober.com/magazine/building-a-safe-ethical-ai-companion-for-sobriety (last visited May 20, 2026).

the proposed class; and (c) at least one member of the proposed class is a citizen of a state different from the Defendant.

28. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*

29. This Court has personal jurisdiction over Koby Empire because it has purposefully availed itself of the privilege of conducting business in California by distributing the App to California residents through Apple's iOS App Store and Google's Play Store, collecting personal data from California users, and deriving revenue from California users through in-app purchases and premium subscriptions.

30. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this District, as Plaintiff resides in this District and her data was intercepted while she was physically present in this District.

## FACTUAL ALLEGATIONS

### A. Defendant's App and the Sensitivity of the Data It Collects.

31. Koby Empire develops and publishes the Sunflower App, a sobriety tracker and addiction recovery application designed to help users overcome substance abuse—including alcohol, nicotine, cannabis, and other addictive substances.

32. The App provides tools including a sober day counter, milestone tracking, craving management exercises rooted in cognitive behavioral therapy ("CBT"), a guided journaling feature, and a community forum, among other features

33. The App is available for download on both Apple's iOS App Store and Google's Play Store. The App operates on a subscription model with a free trial period, after which a paid subscription is required to continue using the App's features.

34. Users of the App entrust Koby Empire with extraordinarily sensitive personal information including, but certainly not limited to, their substance of addiction, sobriety start dates, relapse history, craving triggers, emotional states, mental health conditions, journal entries describing deeply personal struggles.

35. The information transmitted by users to the App is among the most sensitive categories of personal data recognized by law.

36. Substance abuse and addiction treatment information is subject to heightened federal protections under 42 U.S.C. § 290dd-2, which strictly limits the disclosure of substance use disorder patient records, and its implementing regulations at 42 C.F.R. Part 2.

37. These protections reflect a longstanding legislative determination that the stigma and discrimination associated with substance abuse are so severe that even the mere disclosure of a patient's connection to a treatment provider can cause irreparable harm.

38. Here, the Facebook SDK transmits to Meta the equivalent of such a disclosure: the "onboarding_completed_onboarding" event reveals that a specific, identifiable individual has enrolled in an addiction recovery program, and the App's bundle identifier ("com.kobyconrad.stop-craving-production") identifies the treatment provider by name and purpose with every transmission.

39. Additionally Sunflower Sober is "regulated" and "assisted…by [a] department or agency of the United States" under 42 U.S.C. § 290dd-2 because it maintains an active registration with the National Provider Service, a registry of healthcare providers maintained by the Center for Medicaid Services.

40. The Federal Trade Commission has recognized the acute sensitivity of mental health and substance abuse app data, taking enforcement actions against companies that shared such data with third-party advertising platforms without meaningful user consent.

41. The Commission has further affirmed its commitment to protecting consumers' privacy against the illegal exploitation of health and other sensitive data. [14]

42. The nonconsensual disclosure or mishandling of substance abuse data can cause irreversible harm—undermining users' autonomy, dignity, and equality, and chilling their willingness to seek addiction treatment and recovery support.

43. Because such data touches on the most personal aspects of human health, and because the emerging data-broker economy and artificial intelligence tools make it ever easier to extract, re-identify, and act upon such information, Defendant's obligation to safeguard it was correspondingly grave.

44. Koby Empire's voluntary registration as a mental health provider with CMS, along with its advertisements of NPI registration and its assurances to customers of HIPAA compliance, created a reasonable expectation among users that their sensitive substance abuse data would be safeguarded consistent with healthcare industry standards.

**B.  *Sunflower's Secret Deployment of the Facebook SDK.***

45. The Facebook SDK is a software library maintained by Meta that app developers embed directly into the source code of their mobile applications. [15] Its primary application is to transmit user data to Meta's servers, including through Meta's Graph API endpoint (ep2.facebook.com). [16]

---

[14] *See, e.g., In re BetterHelp, Inc.,* FTC File No. 2023169 (Mar. 2, 2023) (requiring $7.8 million payment for sharing mental health app data with Facebook); *In re GoodRx Holdings, Inc.,* FTC File No. 2023190 (Feb. 1, 2023) (first enforcement under the Health Breach Notification Rule for sharing health data with Meta); FTC Policy Statement on Health Breach Notification Rule (Sept. 15, 2021) (warning health apps of enforcement obligations).

[15] Meta for Developers, *Facebook SDK for iOS*, https://perma.cc/5W3D-4QQ5 (last visited May 20, 2026).

[16] *Id.*

46.    Meta describes the SDK as a toolkit that helps developers "understand how people use the app, run optimized marketing campaigns and enable login and social sharing." [17]

47.    In practice, the SDK collects data about user activity inside the host app and transmits it to Meta's servers, where it feeds into Meta's advertising platform.

48.    The SDK is the mobile equivalent of the Facebook Pixel (used on websites); both are part of Meta's "Facebook Business Tools" suite. [18]

49.    By default, the SDK begins collecting and transmitting data the moment the host app launches, with no action required from the user. The default auto-logging setting (*FacebookAutoLogAppEventsEnabled*) is *true* unless the developer explicitly disables it. [19]

50.    A 2018 Privacy International investigation found that 61% of tested apps automatically transmitted data to Meta the instant a user opened the app—regardless of whether the user had a Facebook account. [20]

51.    The Facebook SDK automatically collects and transmits the following categories of data to Meta's servers:

   a. **Device identifiers:** The SDK collects the Apple Identifier for Advertisers ("IDFA"), a unique persistent identifier assigned by Apple to each iOS device, and transmits it to Meta as the "advertiser_id." The

---

[17]Meta Blueprint, *Get Started with the Facebook SDK and App Events for Android and iOS*, https://perma.cc/7G4U-D66Q.

[18]Meta Platforms, Inc., *Facebook Business Tools Terms*, https://perma.cc/XYP3-2TKE (last visited May 20, 2026).

[19]RudderStack, *Facebook App Events Destination*, https://perma.cc/RCH4-63B7 (last visited May 20, 2026) (documenting the SDK's consent configuration settings).

[20]Privacy International, *How Apps on Android Share Data with Facebook – Report* (Dec. 29, 2018), https://perma.cc/K4T2-GKCG.

CLASS ACTION COMPLAINT

11

SDK also collects the Identifier for Vendors ("IDFV"), which identifies the device on a per-vendor basis. [21]

b. **App Events:** The SDK records and transmits "App Events"—structured data describing specific user actions within the application—to Meta's servers via Meta's Graph API endpoint. These events include application launches, in-app purchases, content views, searches, and custom events defined by the developer. [22]

c. **Device fingerprinting data:** The SDK collects and transmits detailed device information that collectively forms a unique device fingerprint, including the precise device model, operating system version, locale and language settings, timezone, screen resolution, and the full user agent string.

d. **IP address:** The SDK transmits the user's IP address with each server request, which reveals the user's approximate geographic location and serves as an additional data point for identity resolution.

e. **Advertising tracking status:** The SDK transmits a flag labeled "advertiser_tracking_enabled" that indicates whether the data is being used for advertising purposes.

52. Once user data is received by Meta's servers through the Facebook SDK, Meta incorporates that data into its advertising ecosystem, where it is made available to third-party advertisers in several ways:

a. **Custom Audiences:** Advertisers can upload lists of customers or targets (using identifiers such as email addresses, phone numbers, or device

[21]Meta for Developers, *App Events API Reference*, https://perma.cc/8CEW-K984 (last visited May 20, 2026).

[22]Meta for Developers, *App Events: Getting Started*, https://perma.cc/W57N-E73D (last visited May 20, 2026).

IDs), and Meta matches those identifiers against its database—which includes data collected through the Facebook SDK—to serve targeted ads to matching users across Meta, Instagram, and the Meta Audience Network. [23]

b. **Lookalike Audiences:** Meta uses data collected through the SDK to identify users who share behavioral and demographic characteristics with an advertiser's existing customers, enabling advertisers to target new users who are statistically likely to be interested in their products—based in part on in-app behavioral data collected from entirely unrelated applications.

c. **Ad optimization and targeting:** App Events transmitted through the SDK feed directly into Meta's ad delivery algorithm. Advertisers can optimize their campaigns for specific in-app actions (e.g., purchases, registrations, content views), and Meta uses the SDK data to determine which users are most likely to take those actions—drawing on behavioral data collected from across Meta's entire network of SDK-integrated applications. [24]

d. **Attribution and measurement:** Meta provides advertisers with attribution data—including user-level attribution for iOS devices through its Advanced Mobile Measurement ("AMM") program—that links ad impressions and clicks to subsequent in-app actions, enabling

---

[23]Meta for Developers, *Custom Audiences*, https://perma.cc/3WGX-U922 (last visited May 20, 2026).

[24]Meta for Developers, *App Event Optimization*, https://perma.cc/R6XN-AAH9 (last visited May 20, 2026).

advertisers to measure the effectiveness of their campaigns at the individual user level. [25]

53.    Beyond automatic events, developers can configure the SDK to log virtually any user interaction. Meta defines 17 "standard events" that its ad algorithm is trained to optimize for: Purchase, Add to Cart, Add to Wishlist, Initiate Checkout, Add Payment Info, Complete Registration, Lead, Contact, Search, View Content, Customize Product, Donate, Find Location, Schedule, Start Trial, Subscribe, and Submit Application. [26]

54.    Each can carry parameters such as monetary value, currency, content name, and category. Developers can also define up to 1,000 custom event names to track any app-specific action.

55.    Alongside event data, the SDK transmits persistent device identifiers: the Apple IDFA (with advertiser ID collection enabled by default since SDK v13.0.0 [27]), the IDFV, the user's IP address, an advertiser_tracking_enabled flag, and a device fingerprint comprising device model, OS version, screen resolution, locale, timezone, and user agent string. [28]

56.    Once received, Meta incorporates this data into its advertising ecosystem. Advertisers use it to build Custom Audiences and Lookalike Audiences, optimize campaigns for specific in-app actions ("App Event Optimization"), and

[25]Singular, *Facebook (Meta) Ads Attribution Integration*, Singular Help Center, https://support.singular.net/hc/en-us/articles/115003252706 (last visited May 20, 2026).

[26]Meta for Developers, *Meta Pixel Reference*, https://perma.cc/QR3P-4L63 (last visited May 20, 2026).

[27]*See* Top Analytics Tools, *Facebook App Events for Android: Setup Guide* (Feb. 24, 2025), https://perma.cc/V6FZ-GCR2 (last visited May 20, 2026).

[28]Twilio Segment, *Facebook App Events Destination*, https://perma.cc/XHY8-MCMV (last visited May 20, 2026).

obtain user-level attribution data through Meta's Advanced Mobile Measurement ("AMM") program. [29]

57.    In short, the Facebook SDK operates as a pipeline that extracts detailed user data from third-party applications and feeds it into Meta's advertising infrastructure, where it is used to build comprehensive user profiles, serve targeted advertisements, and measure advertising effectiveness—all without the knowledge or informed consent of the application's users.

**C.    *The Tracking Technology Intercepts User Communications in the App.***

58.    Network traffic analysis of the Sunflower App reveals that the Facebook SDK is actively embedded within the App and configured to intercept and transmit users' private data to Meta's servers in real time.

59.    Critically, the SDK transmits data to Meta regardless of how a user creates an account or logs into the App—whether through email registration, phone number or any method.

*[Remainder of Page Intentionally Left Blank]*

---

[29]Meta for Developers, *Custom Audiences*, https://perma.cc/3WGX-U922; *App Event Optimization*, https://perma.cc/AF5Z-3FNE; Singular, *Facebook (Meta) Ads Attribution Integration*, https://support.singular.net/hc/en-us/articles/115003252706 (last visited May 20, 2026).

CLASS ACTION COMPLAINT
15

60.    The SDK begins transmitting data automatically upon the App's first launch, independently of any Facebook login or social media authentication.

61.    Although Defendant's Terms of Service reference social login functionality, the intercepted data transmissions occur even when a user has no Facebook account and has never used Facebook's login service.

62.    In the screeenshots above, the App can be seen transmitting HTTP POST requests to Meta's Graph API endpoint at https://ep2.facebook.com/v17.0/1092215802441504/activities. The user-agent string "FBiOSSDK.18.0.3" confirms that the transmissions originate from the Facebook iOS SDK embedded within the App.

63. Intercepted network traffic reveals that the Tracking Technology in Defendant's App is configured to capture and transmit, at a minimum, the following categories of user data:

    a. A unique **app user ID** (the "app_user_id" parameter) that individually identifies each user of the App;

    b. A unique **anonymous identifier** (the "anon_id" parameter) that serves as a persistent cross-session tracking identifier;

    c. An **access token** linked to the App's developer account, confirming the data's transmission to Meta;

    d. Detailed **device fingerprinting data**, including the precise device model (iPhone18,3), operating system version (26.3.1), app version (1.5.110), language and locale (en_US), and the App's bundle identifier "com.kobyconrad.stop-craving-production"—which itself reveals to any recipient that the user is using an application designed to combat cravings associated with substance abuse;

    e. **Custom app events** describing specific user actions within the App (the "CUSTOM_APP_EVENTS" event type), including: (i) the "onboarding_completed_onboarding" event, a developer-configured custom event that is transmitted to Meta when a user completes the App's addiction recovery onboarding process, thereby informing Meta that the user has enrolled in a substance abuse treatment program; (ii) the "fb_mobile_activate_app" event that tracks when a user opens the App; and (iii) the "fb_mobile_deactivate_app" event that tracks when a user closes or backgrounds the App;

    f. An **advertiser_id_collection_enabled** flag set to "1," confirming that the SDK is configured to collect the user's IDFA;

CLASS ACTION COMPLAINT

17

g. An **application_tracking_enabled** flag set to "1," confirming that Defendant has affirmatively enabled application-level tracking within the App's source code. This means that the developer has configured the App to permit the collection and transmission of user data for advertising and analytics purposes;

h. An **is_autolog_app_events_enabled** flag set to "1," confirming that the SDK's automatic event logging feature is enabled, meaning events are captured and transmitted without any affirmative action by the user; and

i. An **is_implicit_purchase_logging_enabled** flag set to "1," confirming that the SDK is configured to automatically capture and transmit data regarding in-app purchases, such as a user's purchase of the App's premium service; and

j. A **Google OAuth client identifier** embedded in the App's registered URL schemes ("com.googleusercontent.apps.[...]"), revealing that the App also integrates Google authentication services. The presence of this identifier in the data transmitted to Meta's servers demonstrates that Meta receives information about additional third-party integrations within the App, further expanding the scope of data available to Meta's advertising infrastructure.

64. The "extinfo" field in the intercepted transmission identifies the App by its bundle identifier "com.kobyconrad.stop-craving-production" and confirms the URL schemes "sunflower," "app.sunflowersober.com," and a Google OAuth client identifier ("com.googleusercontent.apps.[...]") are associated with the App, conclusively linking the transmission to the App and revealing additional third-party service integrations.

65. The bundle identifier itself—"com.kobyconrad.stop-craving-production"—is transmitted to Meta with each SDK request, meaning that Meta

CLASS ACTION COMPLAINT
18

receives an identifier that, by its very name, reveals the App's purpose of helping users stop cravings associated with substance abuse.

66. Critically, the data transmitted by the SDK is not limited to abstract technical metadata. In context, each data point reveals sensitive information about a user's struggle with addiction.

67. The "onboarding_completed_onboarding" event, for example, informs Meta that a specific, identifiable user has just enrolled in an addiction recovery program—a fact that carries profound implications for a user's privacy, employability, insurance eligibility, and social standing.

68. The SDK also captures the time when the App is opened and the duration for which it is active.

69. This is significant because an app-open event at 2:00 a.m. reveals a late-night vulnerability or craving.

70. Furthermore, the frequency and regularity of sessions reveal the trajectory of a user's recovery or relapse.

71. And the very act of opening and using a substance abuse recovery application constitutes a sensitive communication, as it reveals to Meta that the user is struggling with addiction and actively engaged in recovery efforts.

72. In the hands of advertisers, this data can easily be used to prey on vulnerable individuals by the timely deployment of targeted advertisements related to addiction services, or even for addictive products like alcohol or online gambling.

73. Other data recorded by the App and transmitted to Meta is similarly sensitive. For instance, a user's purchase of the App's premium feature (as indicated by the values of the "is_implicit_purchase_logging_enabled" parameter) reveals to Meta the user's financial commitment to overcoming addiction.

74. The persistent identifiers transmitted alongside this behavioral data, the app_user_id, anon_id, and IDFA, ensure that Meta can link this information to a specific, identifiable individual across its entire advertising ecosystem.

75. Moreover, the intercepted traffic confirms that the App continued to transmit user data to Meta even after the user exercised her right under Apple's App Tracking Transparency framework to deny the App permission to track her activity.

76. Specifically, the "advertiser_tracking_enabled" flag in the intercepted transmission was set to "0"—confirming that the user opted out of ad tracking—and the IDFA was transmitted as a zeroed-out value, reflecting Apple's enforcement of that opt-out.

77. Yet the SDK nonetheless transmitted the user's custom app events (including the "onboarding_completed_onboarding" event), persistent identifiers (app_user_id and anon_id), device fingerprinting data, and in-app purchase logging flags to Meta's servers.

78. In other words, the user took the one step that Apple designed to protect her privacy, and the App's SDK configuration rendered that step meaningless.

79. In plain terms, the Tracking Technology feeds granular addiction-related behavioral data into Meta's advertising infrastructure, turning over deeply sensitive and directly identifiable user data in the process.

80. Each transmission constitutes a substantive communication—not mere routing or addressing information—because it conveys the substance and meaning of a user's interaction with the App: that the user is enrolled in an addiction recovery program, that the user is actively engaging with sobriety tools at particular times, and that the user is financially committed to addiction treatment.

81. These communications are as revealing as the underlying conversations themselves, because in the context of a substance abuse recovery application, the

CLASS ACTION COMPLAINT
20

mere fact of engagement—and its timing, frequency, and duration—discloses precisely what the user is struggling with and how that struggle is unfolding.

82.    Defendant's Privacy Policy does not disclose that users' data is transmitted to Meta for advertising and analytics purposes. [30]

83.    At no point during the download, installation, or use of the App is any user informed that their private communications and personal data will be intercepted and transmitted to these third-party advertising companies.

84.    To the contrary, Defendant's Terms of Use represent that user information will be handled "consistent with our Privacy Policy." and the Privacy Policy represents that tracking technologies are used only "to collect and store your information" and that data sharing is limited to "affiliates, business partners, or other users when you interact in public areas of the service"—none of which encompasses the secret transmission of sensitive substance abuse data to Meta's advertising infrastructure. [31]

85.    Defendant did not obtain users' informed consent to the interception and transmission of their private communications and personal data to Meta, despite the heightened expectation of privacy afforded to sensitive purposes like addiction recovery and substance abuse treatment.

### REPRESENTATIVE PLAINTIFF'S EXPERIENCE

86.    Plaintiff Robin Savage currently resides (and at all times herein relevant has resided) in Laguna Woods, California.

87.    In or about early 2025, while living and physically present in California, Plaintiff downloaded and began using the Sunflower App on her Apple iPhone.

88.    Over a period of several months, Plaintiff regularly used the App to support her addiction recovery. During her use of the App, Plaintiff Savage tracked

---

[30] Privacy Policy, *supra*, n. 8.

[31] *Terms of Service*, *supra*, n.11.

her sobriety milestones, logged her cravings and emotional states, engaged with cognitive behavioral therapy exercises,  generating behavioral metadata (including session timing, frequency, and duration) that the SDK intercepted and transmitted to Meta, revealing the intensity and pattern of Plaintiff's engagement with addiction recovery support, and journaled about her recovery journey.

89.     During her use of the App, Plaintiff Savage made in-app purchases and subscribed to the App's premium service, providing Defendant with financial transaction data in addition to the behavioral and personal data generated through her use of the App.

90.     Throughout Plaintiff's use of the App, the Facebook SDK embedded within the App secretly intercepted her private communications and personal data— including her application open and close events, onboarding completion, and in-app purchase activity, device identifiers (IDFA, IDFV, and anonymous ID), IP address, device information, and behavioral data reflecting the timing, frequency, and duration of her App sessions, her completion of the addiction recovery onboarding process, and her subscription and purchase activity—and transmitted this information to Meta without her knowledge or consent.

91.     At no point before, during, or after downloading or using the App did Plaintiff Savage consent to her in-app interactions, personal data, or device identifiers being intercepted and transmitted to Meta as described herein.

92.     Plaintiff Savage did not consent to have her data captured by the Facebook SDK present within the App or to have her private communications intercepted and transmitted to third-party advertising companies.

93.     As discussed, Defendant's Privacy Policy affirmatively misrepresented the nature and purpose of its tracking technologies. The Privacy Policy characterizes its use of tracking technologies as limited to "collect[ing] and store[ing] your

information" and directs users to a "Cookie Notice" for further details. However, no such Notice exists and users are never provided with a Cookie Notice in the App.

94. A reasonable consumer reading this language would understand that Defendant uses standard first-party cookies to remember user preferences and store session data for Defendant's own internal purposes.

95. In reality, the Tracking Technology intercepts and transmits users' sensitive substance abuse data in real time to Meta's advertising servers, including the developer-configured custom event revealing that the user completed the App's addiction recovery onboarding process, as detailed above.

96. The gap between what the Privacy Policy represents (passive, first-party data storage) and what the Tracking Technology actually does (active, real-time transmission of sensitive health data to a third-party advertising company) constitutes both an affirmative misrepresentation and a material omission, which together created the false impression that such sharing would not occur.

97. Plaintiff was unaware at the time that her information was being captured in real time by the Facebook SDK embedded within the App and disclosed to Meta, which collects user data from across apps and the web to create personalized, identifiable advertising profiles combining the sensitive data generated within the App with users' broader digital activity.

98. Had Plaintiff known that Defendant was using the Facebook SDK to capture her in-app interactions and personal data, and that Meta collects user data from across apps and the web to create personalized, identifiable advertising profiles combining the sensitive data generated within the App with her broader digital activity, Plaintiff Savage would not have used the App or would have limited the information she provided and the extent of her engagement.

99. As a direct and proximate result of Defendant's conduct, Plaintiff's privacy rights were violated, and Plaintiff suffered harm in the form of: loss of control

over her private personal data, including highly sensitive substance abuse and recovery information; the unauthorized disclosure of her personal information to a third-party advertising company; loss of the benefit of the bargain in keeping or exchanging her private data; loss of the benefit of the bargain in paying subscription fees and in-app purchase prices for an application that Plaintiff would not have purchased, or would have purchased at a lower price, had Defendant disclosed its data-sharing practices; and other harms related to the undisclosed and nonconsensual interception and transmission of her private communications and personal information.

## CLASS ACTION ALLEGATIONS

100.   Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

101.   Plaintiff seeks to represent the following classes:

**Nationwide Class:**

> All persons in the United States who downloaded and used the App on a mobile device during the applicable statutory period and whose data was intercepted and transmitted to Meta by the Facebook SDK embedded in the App.

**California Subclass:**

> All persons in the State of California who downloaded and used the App on a mobile device during the applicable statutory period and whose data was intercepted and transmitted to Meta by the Facebook SDK embedded in the App.

(together the "Classes"). [32]

102.   **Numerosity:** The exact number of members of the Classes is unknown but, upon information and good faith belief, it is estimated to number in the tens of

---

[32]Plaintiff reserves the right to revise or amend the class definitions based on the discovery of new information.

thousands at minimum, and individual joinder of these claims is therefore wholly impracticable. Members of the Classes can be readily identified through Defendant's records and objective criteria, and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

103. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's wrongful conduct, misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages as a result of Defendant's uniform illegal conduct.

104. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with or are antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

105. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Classes and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to the following:

    a. Whether Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq.;

    b. Whether Defendant violated the California Invasion of Privacy Act, Cal. Penal Code § 631;

    c. Whether Defendant violated the California Invasion of Privacy Act, Cal. Penal Code § 632;

    d. Whether Defendant violated the California Invasion of Privacy Act, Cal. Penal Code § 638.5;

e. Whether Defendant's use of the Tracking Technology is an unauthorized interception of electronic communications;

f. Whether Defendant unlawfully intercepted and manipulated user communications;

g. Whether Defendant was unjustly enriched by collecting and monetizing class members' private information;

h. Whether Defendant breached a contract with Plaintiff and class members;

i. Whether Defendant's representations in the Privacy Policy were deceptive; and

j. Whether Plaintiff and class members are entitled to damages and injunctive relief.

106. **Superiority:** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that class-wide adjudication will provide a realistic means for members of the Classes to receive monetary relief; the monetary damages suffered by members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have equitable recourse for the conduct alleged herein; and because issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiff and her counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

107. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include:

a. Whether Defendant obtained proper consent before recording users' interactions with the App or recording users' information through the App;

b. Whether Defendant's actions violated the App's users' reasonable expectations of privacy; and

c. Whether Defendant's collection of personal information through Tracking Technology constitutes an invasion of privacy.

108. Finally, all members of the proposed Classes are readily ascertainable as Defendant has access to Class and Subclass Members' names, emails and physical addresses.

## CAUSES OF ACTION

### COUNT I

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. §§ 2511, 2520**
*(On Behalf of Plaintiff & the Nationwide Class)*

109. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

110. The Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)(a), prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication.

111. Plaintiff's and Class members' interactions with the App, which include messages and communications that are received and interpreted by the App's servers, constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12). Specifically, the intercepted communications include: (a) developer-configured custom app events that reveal a user's completion of the addiction recovery onboarding process (the "onboarding_completed_onboarding" event), thereby informing Meta that the user has enrolled in a substance abuse treatment program;

(b) application lifecycle events revealing when a user opens and closes the App, which in context disclose the timing and frequency of a user's engagement with a substance abuse recovery tool; (c) in-app purchase data revealing a user's financial commitment to addiction treatment; (d) persistent user identifiers (app_user_id and anon_id) that enable Meta to link this sensitive behavioral data to a specific, identifiable individual across its entire advertising ecosystem; and (e) the App's bundle identifier ("com.kobyconrad.stop-craving-production"), which by its very name discloses to Meta that the user is using an application designed to combat substance abuse cravings.

112. Defendant intentionally embedded the Facebook SDK within the App, which intercepted Plaintiff's and Class members' electronic communications and transmitted the contents of those communications to Meta without the knowledge or consent of Plaintiff or the Class members. The contents transmitted include the substance and meaning of users' interactions with the App: that the user enrolled in an addiction recovery program (the "onboarding_completed_onboarding" event), the precise times the user accessed a sobriety application (app-open and app-close events), and the user's purchase of addiction treatment services (implicit purchase logging)—each of which reveals substantive information about the user's struggle with addiction, not merely routing or addressing data.

113. Defendant aided, abetted, and procured the interception of Plaintiff's and Class members' electronic communications by embedding the SDK in the App and configuring it to transmit users' data to Meta.

114. Neither Plaintiff nor any Class member consented to the interception and transmission of their electronic communications to Meta. Defendant's Privacy Policy does not disclose these transmissions.

115. Moreover, even if Defendant could be deemed a party to users' electronic communications and thus entitled to invoke the one-party consent

exception under 18 U.S.C. § 2511(2)(d), that exception does not apply where "the purpose of such interception . . . [is] to commit any criminal or tortious act." *Id.*

116. Here, Defendant's status as a registered mental health provider under NPI #1700757440 and its stated compliance with HIPAA guidelines means that these unconsenting transmissions to third parties are in violation of federal restrictions on the disclosure of substance use disorder patient records under 42 U.S.C. § 290dd-2 and 42 C.F.R. Part 2.

117. Additionally, Defendant's Privacy Policy misrepresents its data collection practices by failing to disclose the transmission of user data to third parties for marketing purposes.

118. Finally, Defendant's transmission of sensitive third-party data is an intentional intrusion upon Plaintiff and class member's seclusion because a reasonable person would reasonably expect that his or her use of a sobriety assistance application would remain privacy.

119. Therefore, because Defendant's transmission if user data to third parties us both criminal and tortious, the crime-tort exception forecloses any one-party consent defense.

120. Defendant's transmissions of sensitive information to knowingly and intentionally performed for the independent purpose of committing tortious acts in violation of California common law, specifically:

a. Violating Plaintiff's and the class members' right to privacy through the interception by the Tracking Technology in contravention of Defendant's representations, as described herein; and

b. Committing the tort of intrusion upon seclusion through the interception by the Tracking Technology in contravention of Defendant's representations, as described herein.

CLASS ACTION COMPLAINT
29

121.   Furthermore, Defendant intentionally intruded into the private affairs of Plaintiff and Class members by embedding the Facebook SDK within the App and configuring it to intercept and transmit to Meta the contents of users' interactions with a substance abuse treatment application. The interception of highly sensitive data related to a user's

122.   The interception of sensitive intrusion would be highly offensive to a reasonable person. Substance abuse carries profound social stigma; disclosure of an individual's addiction treatment status can result in discrimination in employment, housing, insurance, and personal relationships. No reasonable user of an addiction recovery application would expect or tolerate the covert transmission of this information to one of the world's largest advertising and data brokerage platforms for commercial exploitation. Defendant's conduct was not incidental or inadvertent — it affirmatively embedded and configured the SDK to capture and transmit this data, while simultaneously holding itself out as a HIPAA-compliant mental health provider.

123.   As a direct and proximate result of Defendant's violations of the ECPA, Plaintiff and the Class members have been injured and are entitled to: (a) actual damages or statutory damages of the greater of $100 per day of violation or $10,000, whichever is greater, pursuant to 18 U.S.C. § 2520(c)(2); (b) punitive damages in appropriate cases; (c) a reasonable attorney's fee and other litigation costs; and (d) such other equitable or declaratory relief as may be appropriate pursuant to 18 U.S.C. § 2520(b).

## COUNT II

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
*(On Behalf of Plaintiff & the California Subclass)*

124.   Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

CLASS ACTION COMPLAINT
30

125. Plaintiff brings this claim individually and on behalf of the members of the California Subclass.

126. California Penal Code § 631(a) establishes liability for any person who:

> [I]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> [W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> [U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or
>
> [A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

127. At all relevant times, Plaintiff was accessing and using the App to support her addiction recovery.

128. The Tracking Technology constitutes a device capable of intercepting communications within the meaning of California Penal Code § 631, as it is specifically designed to capture, record, and transmit user interactions and data inputs as they occur.

129. Defendant's assistance in the interception of Plaintiff's and California Subclass members' communications was accomplished without their consent. Specifically:

a. Defendant never obtained express consent from Plaintiff or California Subclass members before implementing the Tracking Technology;

b. Tracking and interception begin immediately upon accessing the App, before any opportunity for users to provide informed consent;

c. Defendant never provided clear, conspicuous notice that users' electronic communications containing sensitive substance abuse information would be intercepted and shared with Meta;

d. Any purported consent was ineffective because the interception began before consent could be obtained and because the disclosures were inadequate under applicable law.

130. The intercepted communications include highly sensitive substance abuse and addiction recovery information that Plaintiff and California Subclass members provided with reasonable expectations of privacy and confidentiality. Specifically, the Tracking Technology intercepted and transmitted to Meta: (a) the "onboarding_completed_onboarding" custom event, which reveals that the user completed the App's addiction recovery onboarding process and thereby enrolled in a substance abuse treatment program; (b) application open and close events that reveal the timing, frequency, and duration of a user's engagement with an addiction recovery application; (c) in-app purchase logging data confirming the user's financial commitment to addiction treatment services; and (d) persistent identifiers (app_user_id and anon_id) that enable Meta to link this sensitive substance abuse data to a specific individual.

131. The intercepted data was transmitted to Meta even after the user expressly denied the App permission to track her activity through Apple's App Tracking Transparency framework, as confirmed by the "advertiser_tracking_enabled" flag set to "0" in the intercepted traffic.

132. Defendant's conduct was willful and intentional, as Defendant deliberately implemented the Tracking Technology knowing it would intercept users' electronic communications without proper consent.

133. As a direct and proximate result of Defendant's violations of applicable state privacy laws, Plaintiff and California Subclass members have suffered injury, including invasion of privacy, loss of confidentiality of personal information, and violation of their statutory rights.

134. Plaintiff continues to desire to use the App's services but has a reasonable fear that electronic communications will continue to be intercepted without consent if using the App.

135. Under Cal. Penal Code § 637.2, Plaintiff and California Subclass members are entitled to:

    a. Five thousand dollars ($5,000) per violation;

    b. Three times the amount of actual damages sustained by the plaintiff; and

    c. Equitable or declaratory relief.

136. Unless enjoined by this Court, Defendant will continue to intercept the communications of Plaintiff and California Subclass members and other App users without their consent, causing irreparable harm for which there is no adequate remedy at law.

## COUNT III

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 632
### *(On Behalf of Plaintiff & the California Subclass)*

137. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

138. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

139. California Penal Code Section 632(a) provides that:

[E]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]

140. California Penal Code Section 632(c) defines "confidential communication" as

"Any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, or other public proceeding in which the public is entitled to attend, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

141. The communications between Plaintiff and class members and the App constitute "confidential communications" within the meaning of Section 632(c) because class members had an objectively reasonable expectation of privacy with respect to private substance abuse and addiction recovery communications, and because Defendant created the false expectation that users' information is not shared with third parties.

142. Defendant intentionally used an electronic recording device—specifically, the Tracking Technology embedded within the App—to eavesdrop upon and record these confidential communications.

143. The Tracking Technology constitutes an "electronic amplifying or recording device" within the meaning of Section 632(a) because it is specifically designed to capture, record, and transmit user interactions and communications in real-time for analytics and behavioral tracking purposes.

CLASS ACTION COMPLAINT

34

144. Defendant intentionally implemented and activated this recording technology within its App with full knowledge that it would capture and record users' confidential communications.

145. Defendant's recording of Plaintiff's and California Subclass members' confidential communications was accomplished without the consent of all parties to the communication, specifically:

a. Plaintiff and California Subclass members never consented to having their confidential communications recorded by the Tracking Technology;

b. Defendant never obtained express consent before implementing the recording technology;

c. Users were not informed that their communications would be recorded and transmitted to the Tracking Technology;

d. No clear, conspicuous notice was provided regarding the scope and nature of the recording of confidential communications;

e. The recording began immediately upon opening the App, before users had any opportunity to review privacy policies or provide informed consent.

146. Defendant's conduct was undertaken intentionally and with knowledge that the Tracking Technology would record confidential communications without proper consent from all parties.

147. The confidential communications that were unlawfully recorded include highly sensitive substance abuse and addiction recovery information, specifically: the user's completion of the addiction recovery onboarding process (recorded by the "onboarding_completed_onboarding" custom event and transmitted to Meta); the timing and frequency of the user's engagement with the App (recorded by application open and close events); in-app purchase activity reflecting the user's financial

commitment to addiction treatment (recorded by the implicit purchase logging feature); and persistent identifiers linking all of this sensitive behavioral data to a specific, identifiable individual.

148. This data was recorded and transmitted to Meta even after the user affirmatively denied the App permission to track her activity through Apple's App Tracking Transparency framework.

149. As a direct and proximate result of Defendant's violations of Section 632, Plaintiff and California Subclass members have suffered harm including invasion of their privacy rights, violation of confidentiality, and loss of control over their sensitive substance abuse information.

150. Unless enjoined and restrained by this Court, Defendant will continue to commit these violations.

151. Plaintiff and California Subclass members have a reasonable fear that their confidential communications will continue to be unlawfully recorded if they use Defendant's App.

152. Pursuant to California Penal Code Section 637.2, Plaintiff and California Subclass members are entitled to:

a. A preliminary and permanent injunction prohibiting Defendant from continuing its unlawful recording of confidential communications;

b. Statutory damages of $5,000 per violation;

c. Punitive damages for Defendant's willful and egregious violations of privacy; and

d. Any other relief the Court deems proper.

153. Plaintiff and California Subclass members seek all available remedies under California Penal Code Section 632 and related provisions for Defendant's unlawful recording of confidential communications.

## COUNT IV

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 638.5
### *(On Behalf of Plaintiff & the California Subclass)*

154. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

155. California Penal Code § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." The statute expressly encompasses not only physical devices but also any "process" that captures such information.

156. The Facebook SDK embedded in the App constitutes a "process" within the meaning of § 638.50(b).

157. The SDK is a small library of functions that, once integrated into a mobile application, systematically captures and transmits to Meta's servers dialing, routing, addressing, and signaling information—including device identifiers, IP addresses, app event metadata, and other electronic signals—each time a user opens or interacts with the App.

158. The SDK operates automatically and continuously, recording and decoding the routing and addressing information associated with every electronic communication transmitted between the user's device and the App.

159. As the court recognized in *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1037 (S.D. Cal. 2023), a software development kit qualifies as a "process" under § 638.50 because it constitutes "software that identifies consumers, gathers data about their online activity, and correlates that data through unique fingerprinting."

CLASS ACTION COMPLAINT
37

160.   Like the SDK at issue in *Greenley*, the Facebook SDK here records and decodes routing and addressing information from users' electronic communications without their knowledge.

161.   California Penal Code § 638.51(a) prohibits any person from installing or using a pen register or a trap and trace device without first obtaining a court order under § 638.52.

162.   Defendant installed and used the Facebook SDK—a pen register—within the App without obtaining a court order authorizing such installation or use. Each time a user launched or interacted with the App, the SDK automatically recorded and decoded routing and addressing information from users' devices—including IP addresses, device identifiers (anon_id), carrier information, and app event signaling data—and transmitted that information to Meta's servers.

163.   Defendant did not obtain the consent of Plaintiff or the California Subclass members for the installation or operation of this pen register, nor did Defendant obtain any court order authorizing its use as required by § 638.51.

164.   As a direct and proximate result of Defendant's violations of § 638.51, Plaintiff and the California Subclass members have suffered injuries. Pursuant to California Penal Code § 637.2(b), Plaintiff and the California Subclass are entitled to recover the greater of $2,500 per violation or three times the amount of actual damages sustained, plus reasonable attorney's fees and costs.

## COUNT V

### INVASION OF PRIVACY
*(On Behalf of Plaintiff & the Nationwide Class or Alternatively on behalf of the California Subclass)*

165.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

CLASS ACTION COMPLAINT
38

166. Plaintiff and Class members had a reasonable expectation of privacy in their personal communications and usage data within the App, which is designed for addiction recovery and substance abuse treatment.

167. Defendant intentionally intruded upon the private affairs of Plaintiff and Class members by secretly embedding the Tracking Technology in the App that intercepted and transmitted their private communications and personal data to Meta without their knowledge or consent.

168. Defendant's intrusion into the private affairs of Plaintiff and the Class would be highly offensive to a reasonable person.

169. Users of a substance abuse recovery application have a heightened expectation that their activities within that application—including their sobriety data, craving logs, and other personal interactions—will remain private.

170. The intrusion is particularly egregious because the data transmitted to Meta reveals that users are struggling with addiction: the "onboarding_completed_onboarding" custom event discloses that a user has enrolled in a substance abuse treatment program; the App's bundle identifier ("com.kobyconrad.stop-craving-production") reveals on its face that the user has a craving-cessation application; and app-open events transmit the precise time a user accesses an addiction recovery tool—information that, in the hands of Meta's advertising infrastructure, can be used to target vulnerable individuals with advertisements for addictive products or services.

171. Moreover, this data was transmitted even after the user expressly opted out of advertising tracking through Apple's App Tracking Transparency framework, demonstrating Defendant's disregard for users' expressed privacy preferences.

172. As a direct and proximate result of Defendant's invasion of privacy, Plaintiff and the Class members have suffered damages, including but not limited to the loss of privacy and the unauthorized disclosure of their private information.

# COUNT VI

## BREACH OF CONTRACT
### *(On Behalf of Plaintiff & the Nationwide Class or Alternatively on behalf of the California Subclass)*

173. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

174. Plaintiff and Class members entered into contracts with Defendant when they downloaded and used the App, the terms of which are delineated in the Terms of Use and Privacy Policy.

175. As part of those contracts, Defendant agreed to handle users' personal data in accordance with its Privacy Policy—including its representation that tracking technologies are used only "to collect and store your information" and its implication that data sharing is limited to "affiliates, business partners, or other users when you interact in public areas of the service"—and to refrain from disclosing users' data to undisclosed third parties for advertising purposes. [33]

176. Users reasonably relied on Defendant's representations regarding its status as a registered healthcare provider and NPI registration in deciding to download and use the App.

177. Defendant breached its contracts with Plaintiff and Class members by secretly transmitting their sensitive substance abuse and addiction recovery data to Meta through the embedded Tracking Technology—including custom events revealing users' completion of the addiction recovery onboarding process, application lifecycle events disclosing the timing and frequency of users' engagement with a sobriety application, in-app purchase data reflecting users' financial commitment to addiction treatment, and persistent identifiers enabling Meta to link this data to specific individuals—in contravention of the reasonable

---

[33] *Terms of Service*, supra, n.11.

expectations created by Defendant's Privacy Policy, NPI registration as a mental health provider, and the nature of the App as a substance abuse treatment platform.

178.  As a direct and proximate result of Defendant's breach, Plaintiff and the Class members have suffered damages, including but not limited to the loss of the benefit of their bargain and the unauthorized disclosure of their private information.

## COUNT VII

### BREACH OF IMPLIED CONTRACT
### *(On Behalf of Plaintiff & the Nationwide Class or Alternatively on behalf of the California Subclass)*

179.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

180.  Plaintiff brings this count in the alternative to Count VI.

181.  Plaintiff and Class members entered into implied contracts with Defendant when they downloaded and used the App. As part of those implied contracts, Defendant agreed to handle users' personal data in accordance with its Privacy Policy and to refrain from disclosing users' data to undisclosed third parties for advertising purposes.

182.  Defendant's Privacy Policy conveyed to a reasonable consumer that any data collection was limited to standard, first-party purposes, claiming that data sharing was limited to "affiliates, business partners, or other users when you interact in public areas of the service" and that data collection was limited to first-party collection.

183.  In reality, Defendant embedded a third-party SDK that secretly transmitted users' sensitive substance abuse data—including custom events revealing their enrollment in an addiction recovery program, the timing and frequency of their app sessions, and their in-app purchase activity — to Meta's advertising infrastructure.

184. Users reasonably relied on the Privacy Policy's representations, Defendant's federal registration as a mental health provider, and the inherently sensitive nature of the App in deciding to download and use the App and to entrust Defendant with their most personal health information.

185. Koby Empire breached the implied contracts with Plaintiff and Class members by secretly transmitting their sensitive substance abuse and addiction recovery data to Meta through the embedded Tracking Technology—including custom events revealing users' enrollment in an addiction recovery program, application lifecycle events disclosing the timing and frequency of users' engagement with a sobriety application, in-app purchase data, and persistent identifiers enabling Meta to link this data to specific individuals—in contravention of the reasonable expectations created by Defendant's Privacy Policy and the nature of the App.

186. As a direct and proximate result of Defendant's breach, Plaintiff and the Class members have suffered damages, including but not limited to the loss of the benefit of their bargain and the unauthorized disclosure of their private information.

## COUNT VIII

### UNJUST ENRICHMENT
### *(On Behalf of Plaintiff & the Nationwide Class or Alternatively on behalf of the California Subclass)*

187. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

188. Plaintiff pleads this claim in the alternative to Count VI and Count VII.

189. Defendant received a benefit from Plaintiff and Class members in the form of their valuable personal data, which Defendant secretly transmitted to Meta. Defendant directly benefited from the Facebook SDK integration by using Meta's advertising platform to retarget users who interacted with the App, to build lookalike audiences to acquire new users, to optimize its own advertising campaigns by

measuring which ad clicks result in app installs and in-app purchases, and to receive aggregated analytics data about its user base—all powered by the sensitive substance abuse data that Defendant's users unknowingly provided.

190. Defendant thus received valuable advertising, analytics, and user-acquisition services from Meta in exchange for its users' private data, including advertising revenue and other valuable consideration.

191. Defendant's retention of the benefits conferred by Plaintiff and Class members—their personal data—is inequitable and unjust because Defendant obtained those benefits through the secret interception and transmission of users' private communications without their knowledge or consent.

192. Plaintiff and Class members are entitled to disgorgement of the revenues and profits Defendant obtained as a result of its unjust enrichment.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Robin Savage, individually and on behalf of the Classes, respectfully requests that this Court enter judgment against Defendant Koby Empire, Inc. and award the following relief:

A. An order certifying the Classes as defined herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Statutory damages under the ECPA, 18 U.S.C. § 2520(c)(2), of the greater of $100 per day of violation or $10,000, whichever is greater, for each Class member, plus punitive damages;

C. Statutory damages under CIPA, Cal. Penal Code § 637.2(a), of $5,000 per violation for each California Subclass member;

D. Compensatory and consequential damages in an amount to be determined at trial;

E. Disgorgement of Defendant's ill-gotten revenues and profits;

F. Injunctive relief requiring Defendant to cease the unauthorized interception and transmission of users' data to Meta and other undisclosed third parties;

G. Pre-judgment and post-judgment interest as allowed by law;

H. Reasonable attorney's fees and litigation costs pursuant to 18 U.S.C. § 2520(b)(3) and Cal. Penal Code § 637.2;

I. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the Classes, hereby demands a trial by jury on all issues so triable.

Dated: June 1, 2026                    Respectfully Submitted,

                                        */s/ Victor J. Sandoval*

                                        Victor J. Sandoval (SBN 344461)
                                        Lucas Coughlin*
                                        **ALMEIDA LAW GROUP LLC**
                                        3415 S. Sepulveda Blvd Suite 1121
                                        Los Angeles, California 90034
                                        (562) 534-5907
                                        victor@almeidalawgroup.com

                                        *Pro hac vice application forthcoming*

                                        *Attorneys for Plaintiff & the Putative Classes*